## WIGGIN v. PLUMER.

If an administrator is removed, pending a suit against him as such, and his successor appears and assumes the defence, he becomes a competent witness in the case, as he is no longer a party, nor liable for the costs.

An offer of evidence of what was said by a party accompanying his act, must be limited to what was said relative to, or connected with the act, or it may be properly rejected.

If a party introduce evidence tending to prove two facts, both material, he cannot preclude evidence to disprove either, by stating that he introduces it to prove one of the facts only, and makes no question as to the other.

Testimony of a witness offered to prove the handwriting of a person, that he cannot swear positively that it is his, or testimony that it has a close resemblance to his, or that he sees nothing differing from the character of his writing, is not admissible, as implying the opinion, or belief of the witness, that it is genuine.

If a witness has made statements conflicting with his testimony, his credit cannot be supported by evidence showing how the truth is, as to particulars not material to the case.

A party may ask his witness if anything said by himself induced him to take notice of what occurred, but he cannot introduce his own statements by asking what he said.

If a juror is shown to have held before the last trial a long conversation about the case, and to have repeatedly expressed decided opinions adverse to the losing party, unknown to him, it furnishes good cause to set aside the verdict.

APPEAL, from the decision of the commissioner upon the estate of Ebenezer Bickford.

The declaration is upon a note, dated December 18, 1844, for $500, payable to the plaintiff, or order, on demand, with interest annually, signed by Ebenezer Bickford, on which four years interest were said to be indorsed. Plea, the general issue.

E. Bickford died on the 8th day of September, 1849. On the 28th of that month, Lane Plumer was appointed administrator. Plumer resisted the allowance of the note by the commissioner, upon the ground that it was a forgery, and when the declaration had been filed in court, made an affidavit denying the signature of the note, and continued to defend the suit until February, 1852, when, upon his

own petition, his trust was revoked, and the administration
on the estate not before administered was granted to J. C.
Moulton; an account of his administration, rendered by
said Plumer, was accepted by the judge of probate, and
he was decreed to be discharged from all liability as admin-
istrator, and said Moulton took upon himself the defence of
this suit. Under these circumstances the court admitted
Plumer as a competent witness upon the trial of the cause.

The note, when produced upon the trial, was much dis-
colored, and was scented with horse manure; a portion of
the signature was wholly illegible, and the rest of the note
was very obscure, though the body of the note could be
read, and was shown to be in the handwriting of the plain-
tiff. The back of the note had some appearance of writing
upon it, but the indorsements could not be read. To ac-
count for this condition of the note, the plaintiff alleged that
his house was broken into in October, 1849, that this note
and three others against N. B. Berry, were in the bottom of
a trunk, which was in his house, but which was then taken
by the plunderers and carried to his barn and broken open
and these notes taken out and left in the stable, where they
remained until March, 1850.

The defendant, on the other hand, contended that these
notes were not in the bottom of the trunk, and were not
stolen, but the plaintiff carried the trunk to the barn him-
self, upon a pretended robbery.

It appeared that in December, 1844, Bickford was a trader
at Meredith, and Wiggin was a farmer and lived at Hebron.
Bickford continued in trade, alone, or with others, until his
death, September 8, 1849. Wiggin continued to reside at
Hebron for about four years after December, 1844, but in
1848 he moved to Meredith, and in February, 1849, pur-
chased a farm of Bickford for $2200. Having paid $800
in cash, on the 6th of April, 1849, he gave Bickford three
notes, and a mortgage back to secure the $1400 unpaid:
one for $400, in one year, one for $500, in two years, and

one for $500 in three years, payable to Bickford or order, with interest annually.   Lane Plumer testified that in June, 1849, Wiggin called and paid $200, which Bickford received with some reluctance, (because he said he did not want it,) and directed it to be applied on the $400 note; the residue of the notes were unpaid at Bickford's death.

In addition to these facts, there was much testimony in respect to the conduct and admissions of the parties to the note, and a large number of witnesses, who gave their opinions upon the genuineness of the signature.

A. C. Philbrick, who was with the plaintiff when he found the trunk, (having been called upon to help find it,) testified, that the plaintiff opened the trunk and looked into it, and there was nothing in the bottom but some linen, which the plaintiff took out; the plaintiff then opened the top of the trunk, and there was a pocketbook containing a bundle of notes and other papers.   The plaintiff's counsel proposed to prove what Mr. Wiggin said, while thus searching the bottom of the trunk, about the Berry notes and the Bickford note, but the evidence was excluded.   The plaintiff's counsel did not particularly state what the declarations were which were made to Philbrick, nor were they requested to do so; but the court inferred that they related to the existence of the notes, and their subsequent larceny from the trunk, and the plaintiff's disappointment at not finding them.   They were offered, as the court understood, as part of the *res gestæ;* and they were rejected, because they were not a part of any act or transaction material to the case.

The defendant introduced J. Neal as a witness, to prove a conversation in the fall of 1848.   The plaintiff's counsel said that his testimony might have a tendency to show that the plaintiff had not the means of loaning the money, but they had no objection to the evidence, if they could be permitted to prove what his means were.   The defendant's council replied that they should make no agreement; that they did not offer to prove by the witness, that the plaintiff

had not the means of loaning the money; they made no point in respect to his general want of ability; but introduced the witness to show that when Wiggin undertook to reckon the notes due to him, and his means of purchasing Bickford's farm, he did not mention the note in suit. No call was made upon the court for a ruling in relation to the testimony of this witness, but he went on and testified, that in the fall of 1848, he examined the Bickford farm at the request of the plaintiff, (who was his brother-in-law,) and on that occasion the witness asked the plaintiff if he thought he should buy the farm, and he said he did not know as he could pay for it, he had not so much money as people talked; the man to whom he sold his farm in Hebron gave notes, and he might have to take the farm back. Col. Berry was owing him $400, and another man one or two hundred dollars, whose name was given, but not remembered by the witness; but nothing was said of any claim against Bickford. Neal made the writings between the parties, in the spring of 1849. Wiggin paid $200 down. Bickford said, if half of the amount was paid, he would run the risk of taking Wiggin's note for the rest, but he objected to taking it for so much, without a mortgage. Wiggin said he did not blame him for not wanting to take his note without security, as he did not know about his circumstances. The business was then postponed to another time, in order that Wiggin might see what money he could raise. When the parties met again, Wiggin paid $600 more, and for the balance gave notes, secured by a mortgage of the farm. No allusion was made to any note held by Wiggin against Bickford.

D. M'Clure testified that he was one of the selectmen of Hebron, and in the spring of 1846, and again in 1847, when taking the plaintiff's inventory, inquired of him if he had any money at interest, and he replied that he had not. This evidence was offered as tending to prove an admission by Wiggin, that he did not hold the note in question, and

not as evidence that he wanted ability to lend the money; and it was so stated at the time the testimony was offered.

Subsequently to the introduction of the testimony of Neal and M'Clure, the plaintiff's counsel proposed to show that he had the means of loaning the amount of this note, and enough in addition to pay for the farm. The court rejected the evidence, because of its tendency to multiply collateral issues, and because it was thought to be too remote for any legitimate inference that Wiggin loaned his money, if he had any, to Bickford. The court instructed the jury that no evidence had been introduced to show that Wiggin had not the means of lending the money, and the testimony was not to be considered in any such view. No point was made in respect to his ability either way, and they were not to conclude that Wiggin had no means but what he specified, for the evidence was not introduced for any such purpose.

Evidence that Bickford was a borrower of money at a bank was excluded for similar reasons. As to this last proposed evidence, it was offered because testimony had been introduced that in August, 1845, a Mr. Tilton and a Mr. Davis took dinner at Wiggin's house, and at the table Wiggin said he thought that Bickford was a very sick man, and would never be any better. Tilton replied that he would leave his family well off, for he had told him but a few days before that no man held a note against him in his private capacity. Davis said he had a note against him, but Tilton corrected him, and said it was against the company of Bickford and Plumer. Wiggin did not speak of having any note against Bickford, or make any further remark about him. This evidence was objected to, but the court ruled that Wiggin's silence upon the subject of his note might be weighed by the jury. The same view was presented to the jury in the charge, and also that the facts might furnish an additional reason why Wiggin would have seen Bickford, and have had the $500 note indorsed upon the other notes, or otherwise adjusted, if he believed that Bickford had made

such a statement to Tilton, and was not likely to recover from his sickness; but that the statement itself was no evidence. No exception was taken to this ruling or charge.

The deposition of D. M. Gale was introduced by the plaintiff. The answers to the interrogatories numbered 9 and 10 were rejected. They were as follows:

Int. 9. Look at the note exhibited to you, (being that on which the action is founded,) and say from the examination of it which you have heretofore made, and that which you now make, whether in your opinion the signature is or not the genuine signature of said Bickford? Objected to.

Answer. My answer is, I don't consider that this is distinct enough for me to swear positively that it is Capt. Bickford's signature. I think it bears a close resemblance to his handwriting, so far as I can decipher the letters.

Int. 10. Do you or not discover anything in that part of said signature which is visible, differing from the character of said Bickford's handwriting?

Answer. No.

John Sanborn, a witness for the plaintiff, testified to a conversation between the parties, in April, 1849, which amounted to a distinct admission of the existence and validity of the note in question, and also testified that Wiggin, at the same time, wanted Bickford to take some railroad stock, and Bickford replied that he was going to Boston and would see how stock was selling, and on his return might take $500 worth. The defendant introduced several witnesses to prove that Sanborn had made contradictory statements about the conversation to which he had testified. G. W. Robinson was introduced by the plaintiff to corroborate Sanborn. The plaintiff's counsel offered to prove by him that in another conversation with Robinson, in April, 1847, Bickford said that Wiggin was wanting him to take some stock in the Concord Railroad. The evidence of Robinson was excluded, because the fact was wholly irrelevant.

D. Smith, a witness called by the plaintiff to prove an in-

dorsement upon the note, was permitted to testify that Wiggin had made certain statements to him which induced him to observe what passed between the parties, but was not allowed to tell what those statements were.

Exceptions were taken to these rulings, except where otherwise noted.

A verdict was found for the defendant. The plaintiff moved to set it aside, because of these rulings, and because, as he alleges, the foreman of the jury was not a disinterested and competent juror. The evidence relative to the last point will sufficiently appear in the opinion of the court.

*H. A. Bellows,* for the plaintiff.

Plumer was not a competent witness. He was a party to the record; was administrator when the appeal was taken; appeared in court; pleaded and took upon him the defence, and, to all intents and purposes, was a party as much as if he had brought a suit, as administrator.

It is true, the administration may be revoked, but the question is, can an administrator, who has become a party to a suit, and has taken upon him the liabilities incident to it, has become a party to an issue framed and to be tried, be permitted to withdraw from the record and become a witness, without the consent of the other side?

It is clear that while a party to the record, or rather to the issue, he could not be a witness, independent of the fact of interest in the result. *Low* v. *Blodgett,* 1 Foster's Rep. 121; *Frear* v. *Evertson,* 20 Johns. 142; *Columbia M. Co.* v. *Dutch,* 13 Pick. 125; *Commonwealth* v. *Marsh,* 10 Pick. 57. So is *Page, Ex'er* v. *Page,* 15 Pick. 368, where the plaintiff, as executor, brought a suit on a note for the benefit of residuary legatees, and was indemnified against costs, on being called by the defendant, and released by him as to costs, he was rejected by the court, as being a party to the record, and this ruling sustained by the whole court.

In *Bauerman* v. *Radenius,* 7 D. & E. 663, admissions of

a nominal plaintiff were held competent. In these cases, the party was excluded, on the ground that he was a party simply.

In the following cases the party was excluded because liable to costs, and in 1 Greenl. Ev. 491 and note, it is said that, in almost every instance, a party to the record is, in the first instance, liable to costs, as in the case of *prochein ami,* guardian, executor, &c.

In *Fay* v. *Whitney,* 16 Mass. Rep. 118, it was held that the administrator was not a competent witness, though the estate was insolvent. It appeared that the claim was presented to the commissioner, and objected to by the administrator, (the estate being represented insolvent,) and that the amount of the judgment the plaintiff might recover, would be added to the list of claims against the estate.

So, just like this case, the court held that the administrator was liable to the costs in the first instance.

So, held that an executor, on an appeal from the decree of the judge of probate allowing the debt, cannot testify to the sanity of the testator, because he is liable to costs. *Sears* v. *Dillingham,* 12 Mass. Rep. 358. And it is there said that an executor, guardian, &c., in that State, are always liable for costs. So is the English law. See cases cited in 1 Greenl. Ev. 491, note 5.

It is said in 2 Cowen's Phillips 135, that all the authorities concur that a party to a suit, though a trustee, such as executor, trustee, guardian, *prochein ami,* is not competent to testify in favor of the interest he represents, because, on failure, he is liable for costs. See authorities there cited. Not even if he resign his trust during the pendency of the action. *Adams* v. *Leland,* 7 Pick. 62. Held that the one so resigning was still liable for the costs. So by the Compiled Statutes, ch. 204, § 1, " costs shall follow the event of every action or petition, unless otherwise directed by law, or by the court. See *Griswold* v. *Chandler,* 6 N. H. Rep. 61 ; *Marston* v. *Marston,* 1 Foster's Rep. 491.

It is pretty clear, then, that the administrator was liable to costs. Could he, then, be discharged from all liability on account of this suit, or interest in it, so as to be a competent witness, by procuring his appointment to be revoked? If he could be discharged of all interest, would it not be against the policy of the law to allow it, on his own petition?

It is true, that such trust can be revoked with the consent of the administrator. Comp. Stat. 405, § 11. And in case of such a revocation, the suit shall not abate, but may be prosecuted or defended by the administrator, who may succeed to the trust, who may be called into court by a *scire facias*, in the same manner and with like effect as in cases of the death of other parties. Comp. Stat. 410, § 11.

In case, then, such administrator is removed, he does not discharge himself of his liability to the plaintiff for costs. That he cannot do without the plaintiff's consent, nor can he substitute another. If he could, it would be the readiest way to cast off such a burthen, if likely to be too great, by substituting a person of no means.

Suppose the administrator removed by death, or by order of the judge of probate, and none appointed to succeed him, the suit would then abate, and the other party would have a claim for costs against his estate, in the one case, and against him personally in the other. It would clearly be so, in case of the death of other parties, and the statute expressly says that the effect should be the same in this case.

So the retiring administrator would have a right to the costs incurred by him, and his removal could not affect that claim, nor any securities held by him. He might probably discharge that claim by assignment to the new administrator, but that was not done. *Drury* v. *Leland*, 2 N. H. Rep. 409.

The account of administration rendered and accepted is not shown to embrace the matter of this suit, and much

less could it operate to release or assign his claim to the cost. He may have chosen not to include the costs in the account, or the judge may have rejected that item. That an account has been settled is no proof that all has been settled; it is contrary to every day's experience.

If the defence prevails, Plumer would be entitled to the costs up to the time of his removal, otherwise to charge his expenses in a new account, like any other item paid since the account rendered, or which may have been omitted.

But if he had improperly engaged in the defence, he could not legally charge the estate with the expenses; therefore he would be interested in sustaining the defence.

So the record, in this case, would be evidence in a proceeding for a devastavit. 2 Cowen's Phil. Ev. 139, note 123, &c. *Lampton* v. *Lampton*, 6 Monroe 616, 619.

The decree of the judge of probate, so far as respects the discharge of the administrator's liability, is, as we think, wholly void. No such power is given to the judge of probate. Particular accounts rendered may be settled on proper notice, but no general discharge can be decreed.

It is, also, against the policy of the law, to allow a change of the parties of record, on their motion, and permit them to testify. So long as they remain parties to the record, they are excluded; and one ground is the danger of perjury. 3 Stark. Ev. 1061.

*J. Bell*, also for the plaintiff.

1. Evidence of the declarations of Wiggin, while searching his trunk, should have been received to show the object of his search. *Plumer* v. *French*, 2 Foster's Rep. 450; 1 Greenl. Ev. 120; 1 Phil. Ev. 194; *Boyden* v. *Moore*, 11 Pick. 362; *Ross* v. *Bank*, 1 Aiken 43; 3 Cowen's Phil. Ev. 210; *Tenney* v. *Evans*, 14 N. H. Rep. 343; *Headley* v. *Carter*, 8 N. H. Rep. 40; *Sessions* v. *Little*, 9 N. H. Rep. 271; *Demeritt* v. *Miles*, 2 Foster's Rep. 523; *Walcott* v. *Keith*, 2 Foster's Rep. 197; *Newman* v. *Bean*, 1 Foster's Rep. 97.

The leading question on the trial was, whether the note was genuine or a forgery. It was defaced and partly illegible; the evidence was introduced to explain its condition. For this purpose, the evidence as to the loss of the trunk, the search for it, the examination of it when found, and that the note was not found in it, was introduced. The statements made by him, while searching for the note, were refused. If the plaintiffs' acts were admissible, he should have been permitted to show, by his declarations at the time, of what he was in search. The question arose, if the loss was real or pretended; and what was said giving character to the acts of the party, should have been admitted as part of the *res gestæ*. The authorities cited support this position. Some of them are closely parallel to the present case. Where the conduct of a party is the subject of evidence, his conversation at the time is evidence. *Tenney* v. *Evans*, before cited.

2. The plaintiff should have been permitted to show that he had the means of loaning the amount of the note, and that it was not necessary for him to set off the amount against Bickford's claims against him. *Demeritt* v. *Miles*, 2 Foster's Rep. 523; *Farmers' Bank* v. *Leonard*, 4 Har. (Del.) 536. That Wiggin did not make an offset of his note on the purchase, was relied on to prove he had none. An offer made to show that he was able to lend this money, and to buy the farm also, was rejected. If Wiggin was straitened so that he could not pay for the farm, it presented a stronger case for the defendant. The evidence, therefore, was both pertinent and important. The question of his ability was material. The question was raised by the defendant's evidence, and we had a right to meet their suggestion of poverty.

3. The testimony of Gale should have been received, both as affirmative evidence and in reply to the defendant's testimony, offered to show the dissimilarity of the handwriting to Bickford's genuine signature. Gale had said

enough to make himself a witness as to Bickford's writing. In the first answer stated in the case, the opinion of the witness is strongly implied. It is not necessary to state the belief in direct terms. The other is evidence, so far as it negatives any dissimilarity. It tends directly to rebut the testimony of the defendant's witnesses on that point.

4.   The statements of Daniel Smith, which were rejected, should have been received, to show in what manner and how strongly his attention was called to the subsequent facts to which he testified, and the jury should have been instructed to disregard them, as evidence for any other purpose.   See *State* v. *Winkley*, 14 N. H. Rep. 481.

5.   George W. Robinson's testimony should have been received.

6.   The foreman of the jury had formed and expressed an opinion in regard to the merits of the case.   See *Tenney* v. *Evans*, 13 N. H. Rep. 466.   The party is entitled to an impartial and unprejudiced jury.   Any cause of challenge, unknown at the time of the trial, is cause to set aside a verdict.   Knowledge of the objection is denied by Wiggin and Robinson.   The fact was disclosed only after verdict.   The evidence shows a long-continued, deliberate conversation of nearly an hour, in which Coffin made full inquiries as to the case, and expressly declared his opinion, and that opinion was several times repeated on other occasions.   When the jury were impannelled, the court inquired if any of the jury had had, or heard, any conversation on the subject, and the juror said nothing.   We impute no intentional wrong, but it is a mere delusion to suppose that a man can hear a cause fairly, after having heard the matter discussed elsewhere. No man can forget such a case, or the opinions he has formed upon it.   If the facts had been known, the juror would have been taken off the panel.

*Perley*, for the defendant.

1.   The evidence of what Wiggin said, when he went to

Wiggin v. Plumer.

the trunk, was properly rejected. The manner in which the trunk was lost, was what required explanation, and no declaration made when it was found, would be part of that transaction. The statement of the party, as such, was incompetent, and no special ground was stated to the court on which Wiggin's statement could be competent. *Gordon* v. *Shurtleff*, 8 N. H. Rep. 260; *Woods* v. *Banks*, 14 N. H. Rep. 101.

2. Evidence of Wiggin's general ability to lend the money was not competent to show that Bickford signed the note in suit, and there was no attempt, by the defendant, to show that he was unable. Evidence that he made no mention of this note when he reckoned up his means, to Neal, and of his denial that he had money at interest, was offered as his admission that he did not hold this note, and were competent for that purpose. There was no exception to the ruling on this point. *Hart* v. *Newman*, 3 Camp. 13.

If evidence is competent for one purpose, and not for another, it may be admitted; as where the confessions of one defendant, tried with others, are given in evidence against him. Even if evidence wholly incompetent, has been admitted, and the jury are instructed not to regard it, the verdict will not be set aside unless there is ground to believe that the evidence improperly influenced the verdict. *Hamblett* v. *Hamblett*, 6 N. H. Rep. 333; *Deerfield* v. *Northwood*, 10 N. H. Rep. 269.

3. Lane Plumer was not a party to the record, and having been discharged by the judge of probate, could have no interest. If the appellant succeeded, his claim would be added to the rest allowed by the commissioner.

4. Gale's testimony to the hand-writing was not admissible. He did not testify that Bickford signed the note, or that he thought or believed the signature to be his.

5. The statement made in Wiggin's presence, that Bickford owed no note in his private capacity, was competent. *Qui tacet consentire videtur*, is the general rule. Wiggin

took part in the conversation, and introduced it. Davis contradicted the first statement, by saying that he held Bickford's note. Bickford was not then expected to live. The conversation and all the circumstances, naturally and strongly called on Wiggin to contradict the statement, if he had the note in question. 1 Greenl. Ev. 240; *Commonwealth* v. *Lee Hart*, Law Reporter, (Dec. 1854,) 476. There was no exception to the ruling on this point.

6. Wiggin's statement, testified to by Robinson, is wholy unconnected with the note, and has no tendency to corroborate the testimony of Sanborn.

7. The foreman was a proper juror to try the cause. The evidence of the jurors is before the court, and shows the foreman behaved with the utmost propriety. There is nothing to raise a suspicion that the juror had any ill will to the plaintiff or any favor for the defendant. The impressions which the juror is charged to have received, were not derived from any of the friends of the defendant, but came from the witnesses and partisans of the plaintiff. There is no evidence that the defendant, or any person in his behalf, attempted any improper influence with the jury.

The simple question is, whether the juror, at the time of the trial, had such a settled opinion on the merits of the case, as disabled him from trying it fairly, and this is a question of fact, which this court must find in the evidence before them. It is not a question of law, raised on a case stated by the court below. When the evidence shows an improper interference by the party, the court do not inquire whether injustice has in fact been done. But the question here is, was Mr. Coffin a fair juror, and was the cause, in fact, fairly tried?

The evidence consists of the recollections of the witnesses as to what the juror said in a mixed and confused conversation, when he had no interest in the subject, and which happened seven or eight months before, and comes from friends and partisans of the plaintiff.

Wiggin v. Plumer.

The testimony of the juror himself is the most important, and the only direct evidence, and it shows that he was entirely indifferent.

There is nothing in the evidence which shows that the juror, at any time, formed a settled opinion as to the merits of the case. There was nothing serious in the conversation; it was mere gossipping talk, which had wholly passed out of the juror's mind, at the time of the trial, and left no impression that could influence his judgment.

Even when the question is to be settled by triors before verdict, to disqualify a juror, he must be proved to have formed a settled opinion; and the case is still stronger where the case has proceeded to a verdict, after a trial, apparently in all respects fair and impartial.

The authorities show that a juror will not be set aside because he has expressed a careless opinion, or a loose statement of a case; he must have formed a settled opinion, which continues to the time of the trial, and disqualifies him to consider the evidence fairly and candidly. The evidence should convince the court that the losing party has not had a fair trial. *McIlvaine* v. *Wilkins*, 12 N. H. Rep. 477; *Commonwealth* v. *Webster*, 5 Cushing, 298; *Ramage* v. *Ryan*, 2 Bing. 333; *Onions* v. *Nash*, 7 Price 203; *Taylor* v. *Greeley*, 3 Greenl. 204; *People* v. *Honeyman*, 3 Denio 121; *Freeman* v. *People*, 4 Denio 9; *People* v. *Bodine*, 1 Denio 281; *Commonwealth* v. *Flanagan*, 7 W. & S. 415; *Simpson* v. *Pitman*, 13 Ohio Rep. 365; *Wiggin* v. *Coffin*, 3 Story 7.

The objection comes after trial, and there is nothing which shows that it was not known to the plaintiff or his counsel. *Rollins* v. *Ames*, 2 N. H. Rep. 349.

BELL, J. Suits, in which an administrator is party, shall not be abated by reason of the death, or of the extinguishment or revocation of his trust, but may be prosecuted or defended by the administrator who may succeed to the

trust, who may be called into court by *scire facias*, in the same manner, and with the like effect, as in case of the death of other parties.   Rev. Stat. ch. 161, § 11.

The effect of the appearance and defence of the action by a new administrator, upon the liability of the old administrator who has been removed, the original defendant is here to be considered.   If the former defendant still remains a party to the action, or if he can, in any mode of proceeding, be adjudged chargeable for the costs, he cannot be a witness.   This depends upon the question, whether after the suggestion of his removal from office, and the defence assumed by the new administrator, any judgment can in any event be rendered against him.   And as we understand the statute, he ceases to be a party to the action on removal from his trust as absolutely as if he were dead, and the action must either be prosecuted against the new representative of the estate, or it will be discontinued.   This results, too, from the nature of the suit, which is a proceeding against the estate of the deceased.   When the administrator is displaced, he ceases to have either interest in or power over that estate, and a judgment to reach the estate must be rendered against the party entitled to represent it.   The judgment, also, must be for a sum to be levied of the goods and estate of the deceased, in the hands of the defendant, administrator, to be administered.   Such a judgment cannot be rendered against one who appears by the record not to be administrator.   In a suit against an administrator, the judgment for costs is but an incident to the judgment for the debt, and if there is no judgment for the debt, there can be none for costs.   We think no example can be found of a judgment for costs until the case is ended.   The original administrator having ceased to be a party and to be liable for costs, the first objection must be regarded as unsupported.

The rule as to the admissibility of statements made out of court, as part of the *res gestæ*, is laid down with clear-

ness in the case of *Sessions* v. *Little*, 9 N. H. Rep. 276. " Where evidence of an act done by a party is admissible, his declarations made at the time having a tendency to elucidate, or give a character to the act, and which may derive a degree of credit from the act itself, are also admissible as. part of the *res gestæ*." And the rule is substantially stated in the same way in *Gordon* v. *Shurtleff*, 8 N. H. Rep. 260 ; in *Plumer* v. *French*, 2 Foster's Rep. 454; and in *Hersom* v. *Henderson*, 3 Foster's Rep. 498. When a fact is offered in evidence, the whole transaction, if it consists of many particulars, may and ought to be proved. Every additional circumstance proved may vary the effect of the evidence, may neutralize it, or give it point. What is then said by the parties, and what is said by others to them, relative to the subject of the transaction, is a part of the transaction itself. It is admissible on the same principle that every other part of it is, that the whole matter may be seen by the jury ; upon the same principle which disallows extracts of written papers, that their effect may be materially varied by the part omitted. Contemporaneous, but otherwise unconnected conversation, is rejected, on the same ground as other unconnected facts. If the statement offered in evidence does not tend to elucidate, or give a character to the acts proved, it is to be rejected. If it is upon the same subject and relative to the act in proof, it should be received.

Brought to this test, the case stands thus; the subject was the search for certain notes alleged to be lost. The evidence proposed was what the party himself said at the time he was making the search. To what did the statement offered relate ? Was it to the search, which was the business in hand, or was it to something else ? If it related to the history of these notes, or to anything else except the actions in which the parties were then engaged, it was inadmissible, because it constituted no part of that search, but was a hearsay recital of some past affair, which threw no light on the business of the search, and derives no credit from it. It

is the mere statement of a party in interest, and therefore inadmissible. Many men habitually indulge in the recital of their version of every transaction in which they feel an interest, whenever anything occurs which reminds them of it, and they are so fortunate as to find a listener. It would be a dangerous rule which would admit such historical statements, because they happened to be detailed when some transaction material to be proved was occurring.

In this case, it does not appear what evidence the witness was expected to give, nor to what subject the conversation was expected to relate. It was properly rejected, because the broad general rule is, that the statements of a party are not evidence in his own favor; and the party who offers such statements is bound to show, that what he expects to prove is admissible under some of the exceptions which the law makes to this general rule. The offer here was to prove what was said at the time of that search about the Berry notes and the Bickford note. That is, anything and everything that was said; the offer being in no way limited, except to what was *then* said. The witness, if the evidence was admitted, might have related the entire history of these notes, and the plaintiff might thus have placed before the jury as evidence, his statement, without oath, of his whole case. This would be clearly incompetent. The offer was too broad. The question to be proposed to the witness should have been confined to the matters connected with the transaction in which the party was then engaged and forming part of it. A ruling in their favor would then have allowed them all the evidence legitimately receivable. A ruling in their favor upon this offer, would have allowed the introduction of evidence clearly incompetent.

The evidence in relation to Bickford's means seems to have been erroneously rejected. The case was one to a great extent depending on circumstantial evidence. The note was defaced. There was conflicting testimony as to the handwriting. Various circumstances were proved tend-

Wiggin v. Plumer.

ing to show the improbability that the plaintiff had been the holder of such a note against the deceased. Among the evidence of this kind was the testimony of McClure and that of Neal, tending to show what amount of means he had, and his want of means to make such a loan. This evidence was avowedly introduced with a view not to disprove the plaintiff's general ability to make such a loan, but for the purpose of disproving the fact that he then held this note; but its evident effect is as well to show general want of ability to loan, as to disprove his having this note. And it seems to us to follow as a necessary consequence, that evidence was as competent to meet this bearing of the evidence as the other. In a case of this kind, evidence relative to the ability of the party to make such a loan seems proper and material. If, for example, the defendant could prove that the plaintiff was destitute of the means to make such a loan, was destitute of property, or was a pauper, it would weigh heavily against his claim; and proof of his actual means, if considerable, would powerfully rebut such testimony. It by no means follows that because a man has ability to loan, that he has actually made a particular loan, as is suggested in the case. But it is no objection to evidence properly of a rebutting character, that its tendency to prove the issue, on the part of the party offering it, is remote. No fact can in the first instance be offered in evidence unless it is material to the issue, but evidence being introduced to prove such fact, any evidence tending to disprove it thereby becomes material and admissible, whether or not it would be received if offered as direct proof of the issue in the case. No party is bound to rely upon the admissions of his antagonist, whether express or implied. When the defendant asserted that he made no question as to the general ability of the plaintiff, and introduced his evidence with no such view, he could not thereby deprive the defendant of his right to rebut the natural effect of such evidence, if he

chose to do so. A well known figure of rhetoric affects to omit a charge only to assert it thereby with greater force.

The question as to the evidence of Bickford's borrowing money at a bank is briefly stated, but seems to stand upon the same ground. That Bickford borrowed money of others, is no proof that he borrowed of Wiggin, but if the administrator introduced evidence tending to show that Bickford was not a borrower, as a circumstance to be weighed in estimating the probability of this note being genuine, the evidence offered was competent to rebut it.

The rule in relation to the admissibility of the opinions of witnesses as to handwriting, is laid down clearly in *Hoitt* v. *Moulton*, 1 Foster's Rep. 594. " By our practice," said the learned judge who delivered the opinion of the court, " and the authorities generally, handwriting may be proved by the *belief* of the witness as to its genuineness, when the witness has seen the person write, so as to have any acquaintance with his handwriting, and this though the witness has seen him write but once. The evidence may be slight, but if he is able to state that in his belief the handwriting is that of the person in question, it is competent to be considered in the first instance, and is sufficient, until some rebutting evidence is offered."

The testimony of the witness, Gale, falls entirely short of this. He does not declare his opinion or belief that it is or is not the signature of Bickford. That he cannot swear positively that it is his, or that it has a close resemblance to his, or that he sees nothing differing from the character of his writing, is nothing to the purpose. The only testimony competent for him to give in the first instance was his opinion, or belief, that it was or was not Bickford's handwriting. For aught which appears, he might have entertained decided opinions either way, but he has not stated them. Nothing but his belief, or opinion, was competent as proof of the signature. The admissibility of the last answer as rebut-

ting proof, would depend upon the character of the defendant's evidence.

Sanborn testified to a fact, which, if believed, was material and important, that the parties, in a conversation, at which he was present, substantially admitted the existence and validity of the note in question. He also added that there was other conversation, (which was of an entirely immaterial character,) that Wiggin wanted Bickford to take some railroad stock. Sanborn was proved to have made contradictory statements as to this conversation. Robinson was offered to prove that subsequently to this, Bickford said in his presence that Wiggin wanted him to take some Concord Railroad stock. This was excluded as irrelevant. It seems to us very properly. The immediate question was whether Sanborn had told such contradictory stories as to destroy his credit. As to this point, it was of no consequence how the truth was. If he had told contradictory stories, it does not help his credit greatly to show on which side he falsified. The fact to which Robinson was called had of itself no relation to the case, and it was equally irrelevant to the question of Sanborn's truthfulness.

The ruling in relation to the remark made by Wiggin to Smith, which induced him to notice what passed between the parties, seems to us correct. The plaintiff cannot introduce his own statements in this way. He cannot go further than to ask if anything was said which led him to notice what was said or done.

The evidence as to what took place at dinner, at Wiggin's, and the charge in relation to it, were not excepted to, and any objection to them was therefore apparently waived. No inference can be properly drawn from a man's silence, unless the occasion was one which properly called upon him to speak. It may well be questioned whether Wiggin was under any duty or obligation to speak of his private affairs to mere strangers, merely because the conversation happened to turn upon the health and property of his debtor. 1

Greenl. Ev. 230 ; 1 Phil. Ev. 356 ; 1 Cow. and Hill's Notes to Phil. Ev. 359.   The evidence, however, was properly submitted to the jury.

As to the objections to the jury, the substance of the matter seems to be, that Mr. Coffin knew nothing of the case until Saturday evening of the first or second week of the February term, when this case was tried, but no verdict was returned.   He was that evening, the case being then partially tried, at a store near his residence at Gilmanton Iron Works, with several others, among whom was Mr. Swain, a neighbor and friend of Wiggin, and one of his witnesses. Coffin inquired of Swain as to the case, and Swain gave him a statement of the evidence, as he understood it.  At the close of the statement Coffin said, " That trunk being stolen, he retaining that note and giving a mortgage of his farm, there is something about it that looks like roguery." He said " Wiggin would lose his note, whether it belonged to him or not," as Swain repeats it.   Another witness says, Coffin spoke of there being a good many bad circumstances in the case.   Of the note being in the manure as one, and of the improbability of Wiggin giving a mortgage and holding a note at the same time.  Three other witnesses represent Mr. Coffin's remarks substantially in the same manner.   The conversation on the subject lasted three-fourths of an hour. This evidence is not contradicted, and there is no reason to doubt that Coffin then expressed a decided opinion against Wiggin.   Three witnesses testify to his afterwards expressing the same opinion, and quite as strongly, at different times, to four different persons.

A juror who had thus prejudged a case, and repeatedly expressed his opinion, cannot be deemed impartial.   No party who knew what he had said against his case, would have consented to his remaining upon the jury, or could be satisfied with his verdict ; but the plaintiff testifies, he knew nothing of it.   Mr. Coffin, doubtless, supposed that notwithstanding what he had heard and said, he could hear the evidence

without bias, and render an impartial decision, but experience does not confirm the soundness of that opinion. When the inquiry was made of the jurors if either of them had heard much of the case, or had formed any opinion, Mr. Coffin should have stated the facts, or excused himself.

The verdict must, for this cause, as well as for the other exceptions before stated,

*Be set aside.*