## DESPIAU v. UNITED STATES CASUALTY CO.

### No. 3144.

Circuit Court of Appeals, First Circuit.
March 15, 1937.

44

L. E. Dubon, of San Juan, P. R. (Hugh R. Francis, of San Juan, P. R., on the brief), for appellant.

Henry W. Hardy, of Boston, Mass. (Ralph H. Willard and Willard, Allen & Mulkern, all of Boston, Mass., and James R. Beverley and Ryder Patten, both of San Juan, P. R., on the brief), for appellee.

Before BINGHAM and MORTON, Circuit Judges, and MORRIS, District Judge.

BINGHAM, Circuit Judge.

This is an appeal from a judgment of the Federal District Court for Puerto Rico in an action at law brought by the beneficiary of an accident insurance policy, to recover the sum of $7,500. The policy was taken out by the plaintiff's husband, Rodolfo Mangual, and covered a period of twelve months from the 10th day of February, 1932. A condition of the policy was that the loss sustained should result "directly and independently of any and all other causes, from bodily injury effected solely through accidental means."

This case has been tried twice. At the first trial, the jury disagreed. Upon the second one, at the close of all the evidence, the court directed a verdict for the defendant.

The question here presented is whether there was substantial evidence from which the jury as reasonable men could have found a verdict for the plaintiff.

Mangual, the insured, met his death on the 21st day of December, 1932, within the twelve months' period. It was due to a gun shot through his right ear, and if his death was without intention or design on his part, it was accidental within the terms of the policy, though the revolver at the time of its discharge was in his own hand; and it was likewise accidental if the shot which caused his death was fired by one other than Mangual and with intent to murder him, and was murder.

In this case, there was no evidence that Mangual was murdered, and in the absence of such evidence, the presumption is that he was not. And the law presumes that he did not kill himself, in the absence of evidence to the contrary. But this presumption disappears and is entitled to little or no weight if the evidence reasonably leads to a contrary conclusion.

We will consider first whether there was any substantial evidence that, if Mangual fired the shot that killed him, it was accidental and not with intent or design.

It appeared, without contradiction, that on the 21st day of December, 1932, some time between half past 11 and 12 o'clock, his usual lunch hour, Mangual drove to his home in his automobile, and instead of waiting to eat his lunch, immediately went to his room, procured his Smith & Wesson 32-caliber revolver, put it in his pocket, returned to his car, and drove away;

that the next that was seen of him was between 12 and 1 o'clock in Boca de Cangrejos, some ten miles distant from San Juan, driving his car alone on a winding trail, on the property of the Succession Borda, leading off from the main road from Santurce to Boca de Cangrejos and being then but a short distance from the main road; that later he was found dead in his car in a lonely spot surrounded by trees on the same estate, the car being parked just off the winding trail and a quarter of a mile or so from the main highway; that the car could not be seen from the highway; that it was about half past 2 or 3 o'clock in the afternoon when he was found dead; that he was then sitting up in the car behind the steering gear, his head leaning back, and the handle of the gun resting in his right hand, its barrel resting on his thigh or the upper portion of his leg; and that a bullet from his revolver had passed through his right ear and entered his brain.

There was no evidence as to the distance the gun was held from the head at the time it was fired except the speculation of experts. A ballistician called by the plaintiff testified that in his opinion the revolver could not have been shot at a distance less than thirteen inches, basing his opinion upon the character of the wound in the ear and the powder marks on the right cheek, some of which were at a point about an inch in front of the ear, others further away. This witness admitted, however, that a wind blowing at the time might vary this estimate, as it would be likely to lessen the amount and character of the marks.

It further appeared that after the body had been bathed, embalmed, and buried, it was dug up and a post mortem examination was had. The doctor who performed the post mortem was called as a witness by the plaintiff. He testified that in his opinion, if the shot was fired by Mangual with the revolver held at a distance of thirteen inches from his head, the hand with the revolver in it would not have fallen across his upper leg or thigh; that it would have fallen farther to the right. He also gave it as his opinion that if the revolver had been held at a less distance it would have fallen across the leg or thigh (the position of Mangual's hand when found dead), and he as well as the ballistician admitted that the powder marks upon the victim would depend upon the direction of the wind and its velocity, showing

that it was entirely speculative at what distance the gun was held, whether six inches or thirteen, if based on powder marks; but reasonably certain when considered in connection with the position of his hand when found.

The evidence was conclusive upon the point that the gun found in Mangual's hand was the one from which the shot was fired that caused his death. And from the evidence above narrated, or any other evidence in the case, a jury could not reasonably find, if Mangual fired the fatal shot, that it was accidental, not intentional or by design. It would justify no other reasonable conclusion than that the shot was fired intentionally and by design. It was a horizontal shot. It was fired from his own gun into his right ear. He was a right-hand shot. He had procured the gun at his house just before leaving there in his car for a lonely place in the woods, remote from his home. In that out of the way place he parked his car just off the trail he came in on and where he was found dead, sitting up in his car, with his gun resting in his hand and a bullet through his head. To permit a jury to say on such evidence that it was not intentional and by design, if he fired the shot, would be simply to permit them to guess without proof.

Would the evidence justify a finding that the shot was fired by some one other than Mangual? We think not; that it would be pure conjecture. The evidence was that he was a right-hand shot; that when found he was sitting in the car with a bullet wound in his right ear and his own gun resting in his right hand, as above stated; that there was nothing about his position, the clothes he had on, or the interior of the car, to indicate that there had been a struggle; and that there was nothing outside the car or on the ground around it (the ground was sand) to indicate any disturbance or struggle. It is highly improbable that any one could have taken his pistol from him and shot him without a struggle or causing any disturbance. All the evidence tended to show that the act was intentional and was the act of Mangual. There was no evidence justifying a finding that some one other than Mangual fired the shot.

Counsel for the plaintiff, in the cross-examination of defendant's witness Archilla, injected into one of his questions incompetent and prejudicial matter undoubtedly intending thereby to induce the jury

to believe that Mangual was murdered. It appeared in the cross-examination of the witness that he had been imprisoned in the district jail of San Juan in 1933, and during the cross-examination he was asked the following question:

"Q. Do you remember having stated to a prisoner by the name of Roberto Antongiorgi on the roof or azotea of the District Jail of San Juan about the middle of 1933, about two months after you started to comply with your sentence, that you having been in a combination with other people, to wit, Soto Berrios, Gonzalez Fantauzzi and a policeman by the name of Rafael Declerc, in connection with a conspiracy to get money out of Mangual, that finally the situation became such that you had to get rid of Mangual; and that at a place near Isla Verde, there being present you, Gonzalez Fantauzzi, Declerc and Mangual, that Mangual was shot by Declerc? Did you make that statement to this man Antongiorgi at the time and place indicated? A. That is not true, and I don't know Rafael Declerc."

Whether the witness had made the statement to Antongiorgi, when both were prisoners in the jail, that Mangual was shot by Declerc, was highly prejudicial and incompetent upon any issue in this case and whether he made the statement or not was likewise incompetent and prejudicial. It was evidently asked for two purposes: (1) To put into the minds of the jury incompetent, prejudicial matter; and (2) if the witness answered the question, no, that he did not make such a statement, in the hope and expectation that he might on calling Antongiorgi as a witness not only procure a contradiction of the answer, but again instill into the minds of the jury the same incompetent prejudicial matter. This is what happened. Antongiorgi was called as a witness by the plaintiff, and was asked the following question:

"Q. At that time and place did or did not this man Archilla state to you that Rodolfo Mangual met his death at the hands of policeman Rafael Declerc in a place out here near Isla Verde, around about the place known as Boca de Cangrejos, or Cangrejos Arriba, he, Archilla, and Luis Gonzalez Fantauzzi being present, and that Mangual was killed because he knew certain things about this group of people, and that they were afraid that he would cause them trouble? A. Yes, sir."

The question asked of Archilla on cross-examination, as to whether he had made the statement to Antongiorgi embodied in the question, being an inquiry as to a matter collateral, incompetent and immaterial to any issue in the case, it was not open to the plaintiff to contradict the answer. Willard v. Sullivan, 69 N.H. 491, 45 A. 400; Cooper v. Hopkins, 70 N.H. 271, 274, 48 A. 100, 101; 1 Gr.Ev. (16th Ed.), § 461e; Best Ev. § 644 and notes.

It would undoubtedly have been competent for plaintiff to have called the witness Archilla and asked him whether as a matter of fact Declerc killed Mangual out at Boca Cangrejos, but it was highly improper on cross-examination to ask him what he had said to Antongiorgi and at the same time inject into the question the prejudicial matter stated. A similar situation existed in Cooper v. Hopkins, supra. In dealing with it, the court said:

"It was hearsay evidence as to the fact asserted. If the fact had been relevant and material,—as it was not,—the proper inquiry of the witness would be, 'What do you now say about it?' not 'What did you say at' a former time, when not under oath? Combs v. Winchester, 39 N.H. 13, 16, 17 [75 Am.Dec. 203]. 'It would be a dangerous rule which would admit such historical statements because they happened to be detailed when some transaction material to be proved was occurring.' Wiggin v. Plumer, 31 N.H. 251, 268. In short, the matter was not relevant to the main issue nor to any collateral issue in the case, and the form of proving it was also incompetent. It was 'positively improper to be proved at all,' and clearly falls within the class of testimony that cannot be contradicted. In Seavy v. Dearborn, 19 N.H. 351, 355, 356, the law on this subject is stated as follows: 'In the cross-examination of witnesses, a great deal of latitude is allowed for the purpose of testing the memory, the capacity, or the honesty of the person under examination, and for that purpose inquiries may be pushed even to matters not positively material to the issue. But this license has various restrictions. In the first place, it does not extend so far as to authorize a party to prove, by a witness on cross-examination, things positively improper to be proved at all; and, secondly, he cannot, for the purpose of discrediting a witness, contradict by other evidence his statements that are improper or immaterial. In other words, he may, for the purpose before indicated, ask questions not strictly relevant to the issue, provided they do not tend to elicit

testimony that is injurious or improper. But, when a question of either kind has been put and answered, the party cannot introduce other evidence to contradict the witness, whether for the purpose of discrediting him or for any other purpose. It is a very plain corollary to that rule that a question not otherwise material or proper does not become so by force of any purpose of the examining party to make use of it to discredit the witness by contradicting his answers to it.' "

But irrespective of what has been said about the contradiction of a witness' answer given on cross-examination as to a collateral and incompetent matter, the answer of the witness Archilla to the question put to him, as to what he had stated at a previous time, was not evidence competent to be considered on any issue in the case, much less evidence from which the jury would be warranted in finding that Mangual was shot by Declerc, for the answer was that he had not so stated, and if his answer had been that he did so state, that would not make it evidence on the issue here.

We are, therefore, of the opinion that, on all the evidence in the case, the jury as reasonable men could not find that Mangual was shot by some one other than himself, and that the District Court did not err in directing a verdict for the defendant. See New York Life Insurance Co. v. Stone (C.C.A.) 80 F.(2d) 614.

The judgment of the Federal District Court for Puerto Rico is affirmed.